The first case this morning is case number 4-18-0258, People v. D'Andres Williams. Appearing for the appellant is attorney David Manchin, and for the appellee is attorney Akshay Matthew. Good morning, gentlemen. Mr. Manchin, are you ready to proceed? Yes, sir. You may. Good morning, your honors. May it please the court. Counsel, this case involves a state appeal to a trial court order, suppressing evidence based on the fact that the police select probable cause to make an arrest. Standard of review is the normal one that you give deference to the trial court's trial court's findings, but make a de novo determination as to the need for suppression. And I think this case, the trial court's decision was incorrect. Based upon the totality of the information based by the officers, the decision to stop and arrest the defendant was eminently reasonable in this case. The totality of the evidence was that there was a shooting with the description of two black men, one in a red-gray multicolored jacket. Four minutes later and a few blocks away, they see two black men apparently walking together, one matching that description. The two men see the police and immediately spill it up, going in different directions. The defendant is seen entering an apartment building and is accosted there. Counsel, let me ask you this. I know that according to the record, there was a question of whether or not the men were actually together. They were walking in line, a few feet apart. Was there any interaction seen between the men when they were observed? No, just the fact that they were there together in very close proximity to each other. This is in a commercial area, but restaurants nearby, not in a residential area. Yes, but apparently these are the only people matching the description that was given that the police saw that night. There was no testimony of anybody else on the streets at this time either. Anybody else or anybody else matching the description? There is no testimony about anybody else, period. The officers testified that they did not see anybody else matching the description, but nobody ever asked that you see anybody else on the streets. So we don't know whether or not there were others on the sidewalk in that area. That's correct. Mr. Manchin said there was no interaction. Was one of them, I think, the defendant, on a cell phone at the time that they were observed? The defendant was, that was what the officer, the sergeant testified that was what he witnessed. Of course, the defendant was on a cell phone. He pulls up alongside where the sergeant turned around. They were about 15 feet apart? That could be correct, yes. I don't recall the exact testimony, but that's probably correct. And that's Sergeant Kaiser? Sergeant Kaiser. He testified that when he spotted the individual with the jacket or maybe a sweatshirt that matched the description given to him, he turned his squad car around. At what point, he testified to the other individual giving a deer in the headlights? Right at that point is where he testified that he gave it. Is that when he made that turn or pulled up, is the defendant got the deer in the headlights look and took off in a different direction than the multicolored coat man, Mr. Stingley? And when you say took off, running or walking? They were both walking when they split up in two different directions. In terms of deer in the headlights look, I envision you ask somebody a question and they basically look back with a blank stare or look. I didn't understand when I read that this individual gave a deer in the headlights look what that looked like. Did Sergeant Kaiser describe this? No, he did not. He just said that he had deer in the headlight looks. I interpreted this, you approach your kid and say, do you know anything about that empty cookie jar? Yeah. I'm caught looking, is how he interpreted it, I think. Again, each individual bit of information in this case that the police had can be picked apart and said, oh, this isn't too bad or that doesn't mean anything. But when you put it all together, given the timing of the incidents, the fact that apparently the testimony is not entirely clear, but apparently Stingley, the man in the multicolored coat was arrested at about the time that the defendant was seen entering the apartment building. And that was the testimony of, I believe it was, not Kaiser or Smith, but I can't remember his name. There was a second officer that arrived that assisted in the arrest of Stingley and the recovery of the gun. And that he testified that at the time they were making the arrest of Stingley, he saw the defendant entering the apartment building. And this information was sent to Officer Smith, who approached the defendant in the apartment building. And the defendant tries to avoid her, lies to her, acts very suspicious. And I think given the totality of the information, the actions of the police in this particular case were eminently reasonable. In regards to that encounter, I'm trying to remember what it was that the defendant was doing. I thought he was standing at the elevator when he was approached by... That was the defendant's testimony. Okay. The officer, Officer Smith, I do not believe testified where she... She just approached him in the lobby, but did not say he was by the elevators. There was testimony by the officer that the defendant did not stop or did not obey a command. And that's where I was trying to understand what the defendant was doing at the time. According to the officer's testimony, what was he doing that led her to testify that he wasn't obeying a command? He ignored her request for him to stop. He did not acknowledge that she was even there, but that he did not actually run away. So it was sort of a... Wasn't she trying to talk to him, and he basically just acted like she wasn't there? That seems to be my impression of the testimony, too. But when he does finally talk to her, he gives her a false name. And at the same time as she's approaching him, the testimony is not clear, and the trial court did not make a clear finding as to when the actual arrest of the defendant was made. But I submit that the arrest was probably made at the time that Sergeant Kaiser entered the apartment building and told Schmidt, yes, that's the guy I saw on the streets. And what about this issue of different officers knowing different things, and can that be attributed to other officers? That's correct. Yes, Your Honor, under the collective knowledge theory, the knowledge that all the information known to all the police officers can be lumped together by the courts to determine, yes, was all this information sufficient to establish probable cause, and the individual officer making the arrest does not have to have all the information known by all the officers. But in this particular case, we have Sergeant Kaiser, who's the first responding officer, who sees them on the street, puts out a call saying, I've spotted a man in a red coat, and the man in the, I've seen her suspect that a man in a red coat is going, I believe, northeast. She, Officer Schmidt testifies that she hears a report of a shooting involving a man in a red coat, and hears a call that this man is going into this particular apartment building. Sergeant Nipper, I mean, Officer Nipper testifies that as to placing the call, that the man in the red coat was going into that building. So we do have the Officer Schmidt being just about fully aware of everything that every other officer knows, with the possible exception that the second suspect's family has been arrested and that the gun has been recovered. But the common knowledge does, you don't have to have each individual officer independently having a probable cause. Is there no further questions? I don't see any. Thank you. Mr. Matthews responds. May I please have the card? Counsel. My name is Akshay Matthew, and I represent Mr. Dontrez Williams in this appeal. In the proceedings below, the trial court correctly held that Mr. Williams was illegally seized by Danville Police, and the court correctly suppressed evidence that was obtained as a result of that illegal seizure. On appeal, the state's sole argument is that the police had probable cause to justify Mr. Williams' arrest. The state is incorrect in this assertion, and therefore this court should affirm the ruling of the trial court. I want to begin by going through some of the factual backgrounds of this case. It's important to remember that this court should give great deference to the factual findings of the trial court. So this case stemmed from a shooting that occurred in Danville, Illinois, and the suspects in the case were described as two black men, and one of the black men was wearing a red, black, and gray jacket. Four minutes after this, and about a half a mile away, Officer Kaiser spotted a man in a red jacket. Now, he was walking 15 feet in front of another black man who matched the description of a red, black, and gray multi-colored jacket. The state says that they were walking together, but I would point to the court's factual findings that the court explicitly states that they were not walking together. So this court should give deference to that finding, that the two were not talking to each other, and they were not communicating with each other. Was there any mention of not only a man in the multi-colored jacket, but also one in a red jacket? No. The second suspect, the sole description of that suspect is that he was a black man. So there's two black men, one had the multi-colored jacket. So the officer who went to the apartment building, didn't she testify to something about someone being in a red jacket? So how did that come about? There is some ambiguity. I think she references two calls. Well, wasn't it after Sergeant Kaiser spotted the two on the street and the defendant went off in a different direction, wasn't there another description given in this time identifying a second individual wearing red? Yes. I believe it was Officer Knipper who had a call out that the man in the red jacket who was walking away. And that is probably what Officer Smit was referring to, about a person in red. That was never part of the original dispatch call about the description of the suspect involved in the shooting. That comes from Officer Kaiser, who relayed that to Officer Knipper, and he had a call out. Officer Kaiser arrested the multi-colored jacket wearing man, and as that was happening, the man in the red jacket continued walking away. But changed direction? He changed directions before, and the state is, I think, exaggerating on how big of a direction change it was. I believe Kaiser testified that they were originally going northbound, and then he went in the northeast direction. So essentially, and this is a small street, so he may have crossed the street. Assuming that this was Mr. Williams in the red jacket, the Merck Manor was located in the northeast, in the eastern direction. So it wouldn't be unusual for someone to have turned that way at that point. Do you know if it was verified that his mother and aunt lived in that building? Based on the record, it wasn't. I don't believe it was verified by the police. There's testimony from Mr. Williams that it was already mapped out. Officer Kaiser, while arresting the multi-colored jacket man, he did not issue any orders for the man in the red jacket to stop. So at the same time Officer Smith was responding to the shooting, she heard the call out about a man in red located at the lobby of the Merck Manor. Officer Smith testified that Mr. Williams ignored her order to stop. However, the court, she said he didn't try to run or evade her, and the court made a factual finding that Officer Smith couldn't articulate what she meant when Mr. Williams refused her order to stop. Accordingly, I don't think this court should make a finding, or the trial court made a finding in this case that at the very least that Officer Smith couldn't articulate what that order to stop was. Counsel, as we know, we're to look at the totality of the circumstances. So if we were to assume that the gentlemen weren't together as the trial court found, if we were to assume that the defendant failed to not obey an officer's order to stop, does that still mean that there wasn't probable cause given the matching of the description, the changing of direction? What else do we have in this case? The fact that, you know, they were the only ones in the area that matched the description. That type of thing, the gun was found, the other person was arrested. Does that not get us there? No, Your Honor. First, the state does combine both Kaiser and Smith's events, and individually, neither of them have any suspicion, maybe negligible amount of suspicion, nothing rising to the level of reasonable suspicion of probable cause. And the state tends to add those together to try to come to a probable cause. But the thing is, the two officers never, besides from communicating that there was a man with a red jacket who walked away, there was no communication of any of these facts to Officer Smith. Officer Smith was the arresting officer. In the three cases that the state cites where it advocates to combine these two probable, the suspicions of the two officers were Baskin, Maxey, and Green. In all three of those cases, the first officer had either probable cause or reasonable suspicion. And then that officer gave a very detailed description of the suspect, or knew the identity of the suspect, and gave that to the other officer. In Bramlett, which we cite, the court says, in most cases where courts have imputed information from one officer to another for probable cause purposes, those courts have found evidence of some sort of communication between the officers. And that's what's missing here. Well, what about the Maxey case that specifically addresses that issue in saying that even if the information is not specifically known to the officer who makes the arrest, it can be considered? The court also says that the state must demonstrate that a third party's information must bear some indicia of reliability and be sufficient to establish the requisite quantum of suspicion. So even there, the first officer's information, the court stated that they had to look at that and see if that met the requisite quantum of suspicion. And there, the court found that that first officer had reasonable suspicion and communicated it to the second officer. So if we were to find that there was reasonable suspicion, then that's sufficient under Maxey? Not for the first officer? Or to be imputed to the other officer? Even in that case, all that would be imputed would be reasonable suspicion. In Maxey, the second officer did not have probable cause to arrest. It was reasonable suspicion to conduct the Terry stop. And here, the state doesn't argue that this is a Terry stop. I think on oral argument, for the first time, the state argues the timing of the arrest. I don't believe that was in the briefs. But the court's finding is very clear that the arrest came at the very beginning. Even if the arresting officer had reasonable suspicion at the very beginning, that doesn't get us the probable cause, which is what's required for an arrest to be valid. And with regards to the fake name that Officer Smith talked about, the testimony is unclear, first, on when a fake name was given. First, she testifies that Mr. Williams does not speak to her. So the assumption would then be that it was after the arrest, because if he's not speaking to her, he could have provided a fake name. So if they provide a fake name after an illegal arrest, that's still an illegal seizure. When was it identified that the name given was fake? I believe it was at booking. So that's another factor that even at the time of arrest, Officer Smith would not acknowledge that the name was fake. It was probably at booking that they would have realized. Because I believe there's testimony that she thought the birth date, she believed the fake birth date and handed him over to juvenile services. So the assumption there would be it was at booking that they discovered that that was a fake name. Counsel, can you identify precisely what it is that you were asking, that you asked the trucker to suppress? Was it fingerprint evidence? Was it residue? It was two things. It was the gunshot residue test and fingerprint evidence, both of which were taken at booking. Okay. The fingerprints, that evidence was asked to be suppressed because the fingerprints matched the fingerprints on the gun that was found with the other person? That's not in the record before us. It's not in the record? It's uncertain what the evidence actually is. Is it also not in the record that the relevance of the gunshot residue?  Okay. I'm glad you clarified that because I couldn't really tell. So, thank you. And with regards to the deer in the headlights, look, Justice Harris, you had the question and I had that same question. I don't know what that means and I don't think we can assume anything from that without any clarification from Officer Heiser. This is an ambiguity in the record and any ambiguity should be weighed against the appellant in this case, the State. So, that deer in the headlights shouldn't be construed as providing any suspicion. So, ultimately, Officer Smith arrested Mr. Williams without any probable cause, without anything supporting reasonable suspicion. And this is, even taking both of their stories together, which we don't think the court should do, but even if you take both of the information they have together, this still doesn't support probable cause. This is bare bone information that Officer Smith had and she arrested Mr. Williams based on this. This was a violation of his Fourth Amendment rights and the trial court correctly found that this was an illegal arrest and suppressed the evidence. And if this court doesn't have any other questions, I would like to conclude by asking that this court affirm the ruling of the trial court. All right. Thank you, Mr. Matthew. Mr. Manchin, rebuttal argument? Mr. Manchin, can you start with this issue of the giving of the fake name? Do we know from the record when this occurred? Officer Smith testified that when she, the defendant evaded her, but when she approached him, he gave her that name. When she finally was able to approach him and talk to him, that's the name and age he gave. At the apartment complex? At the apartment complex, yes. Prior to the arrest? Since there's no testimony as to the exact time she made the arrest, it's unclear whether that, it was the first thing that the defendant, the only thing that the defendant, the only thing that's clear from record is that the first thing the defendant said to her when she finally approached him was that he was able to talk to her. Unless you're going to rule that the arrest was made the very second she said, I want to talk to you, and he talks to her, I think you can still take the fake name into account. Because it's all part of his whole evasive demeanor and conduct in this case. Well, why would we take that into account unless the officer knew the name given to her was fake? Wouldn't that be the ultimate relevant question? Did the officer know it? That's correct. And as far as your question as far as what was suppressed, the record does not show the results of the fingerprints or the gunshot residue. But we have to assume that they're negative to the defender. He would not be bothering to suppress them. But if the information... Well, could we also assume the state's case would not be impaired unless there was something negative about the evidence that was gathered? That's correct, because the state's attorney does, with his notice of appeal, does certify that the suppression of order impaired his ability to prosecute. So we have to assume that the results were negative to the defendant. But I think taking all the evidence together, and you cannot do what the defendant suggests, is that you have to consider... And you have to ignore anybody else's information. That is simply not the law. The collective knowledge, even if the arrested officer doesn't have that information, is sufficient. And I think the bottom line in a probable cause of determination is whether, based upon the totality of the evidence, would the police officers act in a reasonable way. And given the facts in this case, the timing, the very close proximity to the crime scene, and the fact that the police officers acted in a reasonable way, I think the bottom line in a probable cause of determination is whether, based upon the totality of the evidence, would the police officers act in a reasonable way. So, the defense has four minutes and a half-mile as being something hard to do. My office is not more than half-mile from here, and I can walk that in five minutes, and I'm an old guy with asthma. So, the time and distance, I think, is very probative here as far as, you know, is it likely that these two guys walking on the streets, that the only two black guys skimming the streets, have been implicated? Four minutes after shooting, they act suspicious, split up, go in different directions. I think that's all taken together. The police acted very reasonably in making the rest of this case. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall issue.